Filed 9/30/21  Thompson v. Lujan CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| MICHAEL L. THOMPSON, Plaintiff and Appellant, v. MANOLITO LUJAN et al., Defendants and Respondents. | F078946 (Super. Ct. No. S1500CV281151) **OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Thomas S. Clark, Judge.

Michael L. Thompson, in pro. per., for Plaintiff and Appellant.

Law Office of Brandon Martin and Brandon Martin for Defendants and Respondents Manolito Lujan, Mei Lujan and Lujan Enterprises, Inc.

Belden Blaine Raytis and Kaleb L. Judy for Defendants and Respondents Michael Dorner and Michele Dorner.

-ooOoo-

Plaintiff Michael L. Thompson sued defendants Manolito and Mei Lujan (the Lujans)[1] and Michael and Michele Dorner (the Dorners), alleging they improperly influenced Patricia Pavlik and caused her to transfer to them real and personal property in which Thompson claimed an interest. A court trial was held. At the close of Thompson's evidence, defendants moved for judgment pursuant to Code of Civil Procedure section 631.8.[2] The trial court evaluated the evidence, found in favor of defendants, and granted their motion for judgment. Thompson appealed.

Thompson contends the trial court erred by (1) granting the Lujans' section 473 motion for relief from default, (2) failing to make findings regarding Pavlik's violations of the family court's restraining orders, (3) excluding evidence of a probate order confirming Thompson's rights in real property, (4) finding he was not a credible witness, (5) abusing its discretion in denying his motion to continue the trial and reopen discovery, and (6) misapplying the five-year rule when setting the trial date. He also contends this court should grant his motion to present additional evidence on appeal and then make factual findings on appeal pursuant to the authority granted appellate courts by section 909. We disagree and affirm the judgment.

## FACTS

In 1975, after Thompson was convicted on two counts of first degree murder and other crimes, the Orange County Superior Court sentenced Thompson to state prison for life with the possibility of parole. (*In re Thompson* (1985) 172 Cal.App.3d 256, 258.) At the time of trial in this case in 2015, Thompson had been incarcerated for 45 years. During his incarceration, Thompson and Pavlik met while both were working with the

---

[1] Thompson also named Lujan Enterprises, Inc. as a defendant. Lujan Enterprises, Inc. apparently was a company founded and operated by the Lujans as a vessel for their various business ventures. For purposes of this decision, "the Lujans" will refer collectively to Manolito Lujan, Mei Lujan, and Lujan Enterprises, Inc.

[2] All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

2.

Organized Crime Unit of the Los Angeles County Sheriff's Office. At the time of their meeting, Thompson was a participant in a witness protection program maintained by the Department of Corrections and Rehabilitation, and Pavlik had been hired by that program to cover up various tattoos on Thompson. From 1983 to 1986, Thompson and Pavlik engaged in several business ventures, all related to the tattoo industry. The primary tattoo pigment business was called "Cleo Colors," which Pavlik ran as a sole proprietorship.

In 1988, Thompson ostensibly married Pavlik. During the ostensible marriage, Pavlik acquired certain real and personal property with the proceeds of their business ventures, including a 22.5-acre ranch (the Tehachapi Property), as "an unmarried woman."[3] According to Thompson, he and Pavlik agreed that all assets co-owned by himself and Pavlik would become the sole assets of the surviving partner upon the death of either partner.

The Lujans and the Dorners apparently shared a working and personal relationship with Thompson and Pavlik, centered on the various tattoo-related businesses and the Tehachapi Property. Following Pavlik's diagnosis of emphysema in 2000, Thompson agreed to allow the Lujans to live in the caretaker's residence of the Tehachapi Property in exchange for caretaker services.

Pavlik filed for divorce from Thompson in 2006.[4] Pavlik's divorce petition asserted that the Tehachapi Property, "Ranch Equipment," and a business called "Permanent Eyes" were her separate property. In response to Pavlik's divorce petition, Thompson confirmed that various pieces of personal property (including the ranch equipment and Permanent Eyes) were Pavlik's separate property, but he claimed a

---

[3]    According to Thompson's fourth amended complaint and his trial testimony, because of his status as a cooperating protected witness, the Los Angeles County Sheriff's Office recommended that Pavlik should retain all co-owned revenues and assets accrued during her business ventures with Thompson in her name only, in order to protect Pavlik from any discoverable association with Thompson.

[4]    Kern County Superior Court case No. M-1502-FL-2056.

3.

community property interest in the Tehachapi Property. As a result of the summons served in the divorce action, both Thompson and Pavlik were restrained, pursuant to Family Code section 2040, subdivision (a)(2), from disposing of or transferring any real or personal property without notice of hearing through the Kern County Superior Court.

Nevertheless, on February 7, 2007, Pavlik, via grant deed, as grantor of her living trust, transferred her title to and rights and interest in the Tehachapi Property, together with all buildings and improvements thereon, to herself, as the trustee of her living trust. Then, on October 6, 2008, via a deed of trust, Pavlik (individually and as trustee of her living trust) granted and transferred to Manolito Lujan as beneficiary of her trust the right, title, and interest in the Tehachapi Property, and gave to Manolito Lujan as beneficiary of Pavlik's trust the right, power, and authority to collect and apply rents, issues, and profits originating from the Tehachapi Property (as repayment of a loan from Manolito Lujan to Pavlik in the amount of $350,000). In 2011, Pavlik transferred ownership of Cleo Colors from her trust to Michele Dorner.

Thompson later alleged that the loan agreement with Manolito Lujan was a sham designed to coerce Pavlik to defraud Thompson of his property rights in the Tehachapi Property. Thompson further alleged that the Lujans and the Dorners took advantage of Pavlik's incapacitation and Thompson's incarceration to wrongfully obtain ownership of Thompson and Pavlik's jointly owned property, in particular the Tehachapi Property and Cleo Colors.

While the proceedings were pending in the family court, Pavlik sought to have the marriage annulled instead of dissolved, asserting that she had discovered Thompson was still married to his previous wife when he married Pavlik.

In the family court, the annulment trial was continued multiple times to allow Thompson to be present, and it was eventually held at the prison. Both Thompson and Pavlik testified at the trial and both were represented by counsel.

4.

Pavlik died on February 5, 2012. At the time of her death, the family court proceedings had not yet been finalized.

On February 24, 2012, the family court annulled the marriage (the 2012 nullity judgment) because it found that Thompson was never properly divorced from his previous wife. The court also assumed Thompson was aware of the invalidity of his marriage to Pavlik and thus he could not assert any putative spouse rights.

On July 23, 2012, Michele Dorner, as trustee of Pavlik's trust, conveyed to the Lujans ownership of the Tehachapi Property, purportedly in accordance with the terms of Pavlik's will. On August 17, 2012, Manolito Lujan recorded the grant deed to the Tehachapi Property.

On December 14, 2012, even though the marriage had been annulled, Thompson filed a spousal property petition with the probate court, requesting determination and confirmation that Pavlik's one-half community property interest in the Tehachapi Property had passed to and belonged to him as Pavlik's surviving spouse.[5] The Lujans and the Dorners were not made parties to or given notice of the action. Nor was the probate court informed of the family court's 2012 nullity judgment. On August 31, 2013, the probate court granted the petition, confirming in a probate order that Thompson owned Pavlik's share of the Tehachapi Property (the 2013 probate order).

According to Thompson, he subsequently attempted to file a change of ownership of the Tehachapi Property with the county recorder but discovered that a change of ownership had already been filed by the Lujans.

---

[5]     Kern County Superior Court case No. S-1501-52409.

The record is not entirely clear whether this petition was filed on December 14, 2012, or November 26, 2012. We believe the former is more likely; nevertheless, the date is irrelevant to the issues.

5.

## PROCEDURAL HISTORY

On January 24, 2014, Thompson filed suit against the Lujans, claiming they had defrauded him of the Tehachapi Property, in collusion with Pavlik. Thompson's causes of action were for conversion, declaratory relief, breach of the implied covenant of good faith and fair dealing, and imposition of a constructive trust. Thompson sought $1.5 million in compensatory and punitive damages. On July 8, 2014, the Lujans demurred to Thompson's complaint. On August 25, 2014, the trial court sustained the demurrer with leave to amend.

On September 23, 2014, Thompson filed a first amended complaint, alleging intentional torts, including loss of use of property and loss of earning capacity, and again seeking both compensatory and punitive damages.

In October 2014, more than two years after the family court's 2012 nullity judgment, Thompson moved to set aside that judgment, asserting that Pavlik had committed fraud upon the court in securing the 2012 nullity judgment, and in transferring title to the Tehachapi Property to a trust.

On October 27, 2014, the Lujans demurred to Thompson's first amended complaint. On December 15, 2014, the trial court sustained the demurrer with leave to amend.

On January 5, 2015, Thompson filed his second amended complaint. On January 30, 2015, the Lujans demurred to the second amended complaint and filed a motion to strike portions of it. On March 23, 2015, the trial court sustained the Lujans' demurrer without leave to amend and ruled their motion to strike moot. Thompson filed a notice of appeal.

On March 30, 2015, the trial court denied Thompson's October 2014 motion to set aside the 2012 nullity judgment, finding that it was untimely, did not raise new facts, and was not properly served on Pavlik's estate. On May 4, 2015, Thompson filed another notice of appeal.

6.

In 2016, this court addressed Thompson's two appeals. In the first, on September 19, 2016, we reversed the trial court's sustaining of the demurrer to Thompson's second amended complaint in a nonpublished opinion.[6]

In the second appeal, on October 6, 2016, we affirmed the trial court's denial of Thompson's motion to set aside the family court's 2012 nullity judgment in a nonpublished opinion, concluding that the evidence offered by Thompson was, at best, evidence of intrinsic fraud.[7] We noted that a judgment may be set aside based on intrinsic fraud only if the motion to do so is brought within six months of the judgment. In this case, it was brought over two years later.

On May 9, 2017, Thompson filed a third amended complaint, this time also naming the Dorners as defendants. He alleged that after Pavlik became ill, the Lujans and the Dorners colluded to extort Thompson's real and personal property, and that the Lujans misused their position as caretakers in conjunction with Pavlik's infirmity to exert undue influence over Pavlik to convince her to covey to the Lujans property in which Thompson claimed an ownership interest, including the Tehachapi Property.

Finally, on November 2, 2017, Thompson filed a fourth amended complaint—the operative complaint and basis of the trial from which Thompson now appeals—based on legal theories of constructive trust and conversion, seeking $6 million in monetary damages, as well as declaratory relief as to his rights of ownership of all of the business and property interests, both real and personal, that he had allegedly co-owned with Pavlik.

On January 17, 2018, the trial court granted the Lujans' attorney's motion to withdraw as counsel. When counsel withdrew, however, he had not yet filed an answer

---

[6]    *Thompson v. Lujan et al.* (Sep. 19, 2016, F071658). On November 21, 2016, a remittitur was filed in the trial court.

[7]    *Pavlik v. Thompson* (October 6, 2016, F071610). On December 8, 2016, a remittitur was filed in the trial court.

to Thompson's forth amended complaint on the Lujans' behalf. Manolito Lujan informed the court that he had been very ill and unable to work, but he would retain new counsel. The court extended the deadline to file an answer until April 2, 2018.

On April 2, 2018, the Lujans still had not filed an answer, and Thompson obtained an entry of default against them for failure to do so.

At the case management conference on April 19, 2018, the Lujans still had not retained new counsel. The trial court informed the Lujans that they were at risk of a default judgment unless they took immediate action. The court urged them to retain counsel by the end of the day.

On July 10, 2018, Attorney James Braze, from the same firm (Borton Petrini) as former counsel, appeared specially to represent the Lujans. Braze stated he needed to assess what had to be done. The court asked if anyone was opposed to continuing the case management conference to September 19, 2018, as requested by Braze. There were no objections and the date was set.

In the months following the April 2, 2018 entry of default, Thompson repeatedly but unsuccessfully attempted to obtain a default judgment against the Lujans from the trial court.

On September 18, 2018, more than five months after the default, the Lujans, represented by Braze, moved for relief from the default pursuant to section 473, subdivision (b). The motion and the trial court's decision to grant relief are described in part I.A., *post*. After granting relief, the court directed Braze to file an answer by October 1, 2018, and set a case management conference.

On October 18, 2018, at the case management conference, the trial court stated that "[t]he five-year statute" was "going to run about January 23, 2019," so the court proposed setting trial for December 10, 2018.[8] The Dorners then stated they would be

---

[8] Braze represented the Lujans at this conference and at future proceedings.

out of the country on a prepaid vacation during that week. The court changed the trial date to January 7, 2019. Thompson did not object.

On January 4, 2019 (three days before trial was scheduled to commence), Thompson filed an "ex parte application for leave to complete or reopen discovery after a new trial date is set." (Capitalization omitted.) The motion was based on the Lujans' and the Dorners' alleged misuse of the discovery process and their failure to respond to Thompson's discovery requests.

On January 7, 2019, a bifurcated court trial began on the causes of action for declaratory relief and constructive trust contained in Thompson's fourth amended complaint. That day, the trial court determined it would treat Thompson's ex parte application for leave to complete or reopen discovery after a new trial date is set as a motion to continue the trial and reopen discovery.[9] The court denied the motion. The court also denied Thompson's request for a 30-day continuance to respond to motions in limine but did grant a two-day continuance of the trial (to January 9, 2019) for that purpose. Thompson attempted to enter into evidence the declarations of two witnesses, but the court stated there was no authority for it to accept declarations, and the witnesses would have to appear by live testimony and be subject to cross-examination.

On January 9, 2019, the trial court considered motions in limine. In one motion, the Lujans (joined by the Dorners) moved to exclude any evidence of any claim by Thompson to real or personal property based on the alleged (and nullified) marriage between himself and Pavlik, including Thompson's claims based on his alleged status as a putative spouse. Considering the motion, the trial court explained that the family court's 2012 nullity judgment was affirmed on appeal in 2016, and that, as a matter of law, Thompson did not have a right to assert a claim to property based on an alleged and

---

[9] Henceforth, we will refer to Thompson's ex parte application as the "motion to continue the trial and reopen discovery."

9.

nullified marriage to Pavlik. The court granted the motion, thereby excluding any evidence of a claim to property based upon an alleged marriage to Pavlik, including claims based on an alleged putative spouse status. The court further ruled that the 2013 probate order granting Thompson rights in the Tehachapi Property as Pavlik's surviving spouse was not valid and would not be followed by the court.

In another motion, the Dorners (joined by the Lujans) moved to exclude testimony by Thompson of any oral agreement he had with Pavlik that all of their assets would be held in her name only and, upon the death of one of them, would become the property of the other. The court granted the motion, excluding evidence of any such oral agreement between Thompson and Pavlik as being violative of the statute of frauds, as well as Family Code section 852 and Civil Code section 683. The court stressed that its ruling did not exclude evidence of a written agreement.

In a third motion, the Lujans moved to exclude evidence that they had exercised any undue influence over Pavlik in an attempt to convince her not to give her property to Thompson. The motion was made on the grounds that Thompson did not have a valid marital relationship with Pavlik and thus had no inheritable interest to the property, and that Pavlik had transferred her property to a trust and the trustee then conveyed the property to the Lujans. The court granted the motion, noting that the deed from the trust to Manolito Lujan was recorded on August 17, 2012, which was after the family court's 2012 nullity judgment and the termination of the effectiveness of any restraining order that had previously been entered by that court.

After these rulings, the trial proceeded with Thompson's case. Thompson questioned himself and testified on his own behalf, and was cross-examined by both the Lujans and the Dorners. Thompson then informed the court he intended to call two witnesses, Michele Briseno, Pavlik's sister, who allegedly was present when Thompson and Pavlik signed a general partnership agreement, and Jacqueline Miller, an employee of Pavlik and Thompson, who allegedly was aware of the partnership relationship between

Pavlik and Thompson. Miller also is Thompson's mother. At trial the next day (a Thursday), Thompson explained that Briseno had been contacted, but could not appear until the following week, at the earliest. He asked to delay the trial because Briseno was a critical witness to his case. The trial court denied the request, noting that if Briseno "was such a key witness, [Thompson] should have anticipated that and had her subpoenaed." The court allowed Thompson to reopen his case and testify further on his own behalf.

At the conclusion of Thompson's case on January 10, 2019, the Lujans and the Dorners moved for a judgment pursuant to section 631.8. This type of motion required the trial court, as trier of fact, to consider and weigh the evidence presented by Thompson.

After a recess, the court granted the motion for judgment (with respect to Thompson's causes of action for declaratory relief and constructive trust). Specifically, the trial court found that Thompson's claims of a community property interest in the Tehachapi Property (and his putative spouse status) had been previously and finally rejected by the courts. The trial court also rejected Thompson's claims that he had any interest (partnership or otherwise) in the contested assets by virtue of an alleged oral agreement between himself and Pavlik, or an alleged written general partnership agreement signed by himself and Pavlik. The court found Thompson's averments about such a general partnership agreement to be based only on Thompson's own speculation and unsupported conclusions. The court also found that Thompson had adduced no evidence that either the Lujans or the Dorners were liable in any way for the alleged breaches of obligations Thompson contended Pavlik owed him. The court found that, for multiple reasons, Thompson was not a credible witness on his own behalf. The court also concluded Thompson had established no facts to support a conversion cause of action, and thus there was nothing left to be tried in a second phase of the bifurcated action.

11.

On January 11, 2019, the trial court filed a notice of entry of judgment in favor of the Lujans and the Dorners. On March 8, 2019, Thompson, still representing himself, filed a notice of appeal.

## DISCUSSION

### I. *Relief from default was properly granted.*

#### A. The trial court proceedings

On September 18, 2018, more than five months after the entry of default the previous April, the Lujans, represented by Braze, moved for relief pursuant to section 473, subdivision (b). The motion was made "on the ground that the default was entered as a result of mistake, inadvertence, or excusable neglect." Braze's supporting declaration stated that the Lujans' answer to Thompson's fourth amended complaint was due on April 2, 2018, but "[a]pparently [former] counsel withdrew prior to having an opportunity to file an answer to the fourth amended complaint." Braze further declared that his search of the case file did not reveal a copy of the order relieving Borton Petrini as counsel for the Lujans. Nor did he find any correspondence from Borton Petrini to the Lujans apprising them that an answer was due on or before April 2, 2018.

Thompson opposed the motion, arguing that the Lujans' claim that they had not had the opportunity to file an answer was unsupported. He stated: "We've put off the case management hearing five times on behalf of Borton Petrini for 320 days as of [September 19, 2018]."

The court concluded that Braze's declaration "essentially confess[ed] to a mistake on the part of both the clients and the attorney." The court said it understood Thompson's frustration and noted he had made several efforts to obtain a default judgment, but the court stressed that the law prefers resolution on the merits and, given the $6 million in damages sought by Thompson, "it would be a tremendous injustice to

12.

allow this to proceed by way of default." Over Thompson's objections, the court granted the Lujans' motion to set aside the entry of default.

### B. Thompson's claim of trial court error

Thompson contends the trial court abused its discretion in granting the Lujans relief from the default. He argues the Lujans' factual showing in support of their motion for relief from default was substantively insufficient because Braze's supporting declaration was "conclusory" and hearsay and did not meet the "preponderance of evidence" standard of showing "mistake," "inadvertence," "surprise," or "excusable neglect." Thompson asserts that the claimed neglect by the Lujans' former counsel in not filing a timely answer before withdrawing was not excusable, as required by section 473. He also contends relief is not available because the Lujans were not diligent in seeking relief from the default.

The Lujans contend the attorney errors justifying relief were the failure to file an answer and the failure to inform the corporate client of its need to answer, which a corporation can do only through an attorney. They assert that, given Mei Lujan's difficulties with the English language and her unfamiliarity with the American legal system, it was incumbent on the withdrawing attorneys "to either file an answer before withdrawing or inform the client in writing of the client's duty to do so and the potential implications of their failure to do so." They contend this type of attorney error falls within the mandatory relief provision of section 473, subdivision (b).

### C. Applicable legal principles

Section 473, subdivision (b) provides both mandatory and discretionary relief from judgments and dismissals when certain requirements are met. Our analysis begins with the mandatory relief provision, which states in part: "Notwithstanding any other requirements of this section, the court shall, whenever an application for relief is made no more than six months after entry of judgment, is in proper form, and is accompanied by

13.

an attorney's sworn affidavit attesting to his or her mistake, inadvertence, surprise, or neglect, vacate any … resulting default entered by the clerk against his or her client, and which will result in entry of a default judgment, … unless the court finds that the default … was not in fact caused by the attorney's mistake, inadvertence, surprise, or neglect." (§ 473, subd. (b).) When an affidavit complying with this provision is filed, relief is mandatory, even if the attorney's neglect was inexcusable. (*Bailey v. Citibank, N.A.* (2021) 66 Cal.App.5th 335, 349.) Whether the mandatory relief provision has been satisfied is reviewed for substantial evidence where the evidence is disputed and is subject to de novo review where the evidence is undisputed. (*Id.* at p. 348.)

The purpose of this mandatory relief provision is to alleviate the hardship on parties who lose their day in court due to an inexcusable failure to act by their attorneys. (*Zamora v. Clayborn Contracting Group, Inc.* (2002) 28 Cal.4th 249, 257.) Also, providing clients with this protection avoids precipitating more litigation in the form of malpractice suits. (*SJP Limited Partnership v. City of Los Angeles* (2006) 136 Cal.App.4th 511, 516.)

" 'It is well settled that appellate courts have always been and are favorably disposed toward such action upon the part of the trial courts as will permit, rather than prevent, the adjudication of legal controversies upon their merits.' [Citation.] Thus, 'the provisions of section 473 … are to be liberally construed and sound policy favors the determination of actions on their merits.' " (*Zamora v. Clayborn Contracting Group, Inc.*, *supra*, 28 Cal.4th at pp. 255–256; *Rappleyea v. Campbell* (1994) 8 Cal.4th 975, 980 ["[b]ecause the law favors disposing of cases on their merits, 'any doubts in applying section 473 must be resolved in favor of the party seeking relief from default' "].)

### D. Analysis

The Lujan's application for relief was timely because it was "made no more than six months after entry of [the default]." (§ 473, subd. (b).) In addition, the application

14.

was "accompanied by an attorney's sworn affidavit attesting to his [firm's] mistake, inadvertence, surprise, or neglect" that caused the failure to file an answer and the subsequent entry of default. (*Ibid*.)

The trial court did not find "that the default … was not in fact caused by the attorney's mistake, inadvertence, surprise, or neglect." (§ 473, subd. (b).) The absence of such a finding implies the court found the mistake, inadvertence, or neglect of the law firm caused the entry of default. The contents of Braze's declaration provide substantial evidence to support this implied finding. The mistake was the failure to file an answer before withdrawing, which was compounded by the failure to inform the Lujans in writing of the need to file an answer and the deadline for that filing. This mistake was a cause in fact of the default because there would have been no default if an answer had been timely filed.

Consequently, we conclude the application and supporting papers demonstrated that all of the elements required for mandatory relief from default existed in this case. Thompson's reliance on *Kendall v. Barker* (1988) 197 Cal.App.3d 619 for the proposition that the default against the Lujans in this matter was not suffered through inadvertence, surprise, excusable neglect, or mistake is misplaced. In *Kendall*, the attorney submitted a conclusory declaration incompetent to support a motion for relief from default. (*Id*. at p. 624.) Braze's declaration supporting the Lujans' motion was qualitatively different from the declaration submitted in *Kendall*. Braze's declaration described how the mistake occurred based on his personal review of his law firm's files. Thus, he had personal knowledge of the firm's files and actions documented in those files. The facts established by the files are sufficient to prove the law firm made a mistake. Moreover, those facts along with the record of the court's proceedings provide a sufficient basis for the trial court's implied causation finding. Thus, the court properly determined mandatory relief was required under section 473, subdivision (b). Therefore,

15.

we do not address whether relief also was warranted under the discretionary relief provision.

## II. *The trial court had no duty to make findings regarding Pavlik's alleged violations of the family court's restraining orders.*

Turning to trial issues, Thompson first contends Pavlik's transfers of property into a trust violated the family court's temporary restraining orders prohibiting the transfer of property by both parties (Fam. Code, § 2040), and the trial court had a duty to make findings regarding those violations. He argues the trial court's failure to make these findings in its judgment violated his due process rights and resulted in a miscarriage of justice. We disagree.

Section 631.8 provides that if the court renders a judgment in favor of the moving party, it "shall make a statement of decision as provided in Sections 632 and 634." Under section 632, a statement of decision must explain "the factual and legal basis for [the] decision as to each of the principal controverted issues at trial." To comply with this provision, trial courts are not required to respond point by point to the issues posed in a request for statement of decision. (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 983.) A statement of decision is sufficient if it fairly discloses the court's determination as to the ultimate facts and material issues in the case. (*Ibid*.) The term "ultimate fact" usually refers to a core fact, such as an essential element of a claim. (*Ibid*.)

Here, the trial court did not violate its duty to state the factual basis for its decision because whether Pavlik violated the family court's restraining orders was immaterial to the resolution of Thompson's claims that he owned the subject properties. The ultimate fact was whether Thompson held rights to the property allegedly transferred in violation of the restraining orders, not whether a violation occurred.

In his fourth amended complaint, Thompson stated causes of action for declaratory relief, constructive trust, and conversion, which included allegations of his ownership rights in the subject real and personal property. Those causes of action were resolved by

16.

the trial court on the basis that Thompson had not established any ownership interest in the subject properties. Pavlik's property transfers in violation of restraining orders would not create a property right where none existed. Thus, the alleged violations were immaterial to the trial court's determination of whether Thompson owned any of the property interests he claimed.

Accordingly, the trial court had no duty under sections 631.8 and 632 to make findings on the alleged violations. (See *Luitwieler v. Luitwieler* (1925) 71 Cal.App. 50, 58–59 [trial court is not required to find upon any immaterial issue made by the pleadings]; see 1 Witkin, Cal. Evidence (5th ed. 2012) Circumstantial Evidence, § 3, pp. 360–361 ["material" means before the court, disputed, relating to a matter in issue].)

### III. *The trial court did not abuse its discretion in excluding evidence of the 2013 probate order.*

Thompson contends the trial court erred, as a matter of law, when it "invalidated" the probate court's 2013 probate order that granted him rights in the Tehachapi Property as Pavlik's surviving spouse. Thompson argues the motion in limine was not the proper vehicle for the invalidation, and the trial court made factual assumptions not supported by the evidence. We conclude the trial court properly excluded evidence of the 2013 probate order.

The Lujans and the Dorners' motion in limine sought to exclude evidence of any claim by Thompson to real or personal property based on his alleged marriage to Pavlik. The court granted the motion on the ground that the 2013 probate order was void because of the family court's 2012 nullity judgment. The court concluded the void probate order was irrelevant and excluded it from evidence.

The critical issue is whether the trial court erred in determining the 2013 probate order was rendered void by the family court's 2012 nullity judgment. If the probate order was void, it would not have "any tendency in reason to prove or disprove any disputed

17.

fact … of consequence to the determination of" Thompson's lawsuit. (Evid. Code, § 210 [definition of relevant evidence].)

"[A] judgment of nullity declares that the marriage was void from its inception" (*In re Marriage of Seaton* (2011) 200 Cal.App.4th 800, 806)—"that, for reasons *existing at the time of the alleged creation of the marriage*, 'no valid marriage ever existed' " (*In re Marriage of Garcia* (2017) 13 Cal.App.5th 1334, 1347). "A *void* marriage is invalid from the onset regardless whether a judgment of nullity is obtained, because no marriage ever existed." (*Ibid.*) Moreover, "a void marriage confers no rights upon either of the parties to it in respect to the property of the other such as would be conferred by a valid marriage." (*Schneider v. Schneider* (1920) 183 Cal. 335, 337.)

Because the family court's 2012 nullity judgment recognized that no valid marriage ever existed between Thompson and Pavlik, the 2013 probate order, which gave effect to the void marriage, was itself void. And from that void 2013 probate order, no rights of any kind could emanate: " ' "A void judgment [or order] is, in legal effect, no judgment. By it no rights are divested. From it no rights can be obtained. Being worthless in itself, all proceedings founded upon it are equally worthless. It neither binds nor bars any one." ' " (*Rochin v. Pat Johnson Manufacturing Co.* (1998) 67 Cal.App.4th 1228, 1240, brackets in original.)

The trial court properly applied the foregoing rules of law and correctly determined that the 2013 probate order had been rendered void by the family court's 2012 nullity judgment. The 2013 probate order, like the marriage it was based on, was simply a nullity and could "be neither a basis nor evidence of any right whatever." (*Andrews v. Superior Court* (1946) 29 Cal.2d 208, 214–215.) Thus, the void 2013 probate order is not relevant evidence that Thompson held any property rights as Pavlik's spouse. (Evid. Code, § 210.) The court did not abuse its discretion in excluding it from evidence at trial. (*Id.*, § 350 ["No evidence is admissible except relevant

18.

evidence."]; *Willis v. City of Carlsbad* (2020) 48 Cal.App.5th 1104, 1132 [we review the trial court's relevance determinations for an abuse of discretion].)

Thompson's arguments suggest he may use this lawsuit to relitigate the validity of his alleged marriage to Pavlik. We disagree. The 2012 nullity judgment was affirmed on appeal and, therefore, is a final judgment on the merits of the validity or invalidity of the alleged marriage. The doctrine of res judicata, which protects parties in privity to Pavlik, bars Thompson from relitigating issues decided in Pavlik's favor. (See *Mycogen Corp. v. Monsanto Co.* (2002) 28 Cal.4th 888, 896–897.) Therefore, Thompson may not relitigate the validity of his alleged marriage to Pavlik in this lawsuit.

## IV.     *The trial court did not err in finding Thompson was not credible.*

The trial court found Thompson failed to prove that he and Pavlik entered into a written partnership agreement and that any such agreement provided Thompson with an ownership interest in any of the assets owned by defendants. The court supported this failure of proof determination by finding that Thompson's testimony was not credible. The court stated the credibility finding was based on (1) Thompson's interest in the outcome of the case, which provided a motive to fabricate; (2) the timing and convenience of his claims to a written partnership agreement; (3) his failure to produce corroborating evidence; and (4) his conviction of a felony of moral turpitude.

On appeal, Thompson challenges the trial court's finding that he was not a credible witness. The legal context for the court's credibility finding is provided by section 631.8, which authorizes a court considering a motion for judgment to weigh the evidence and consider witness credibility. (*Orange County Water Dist. v. MAG Aerospace Industries, Inc.* (2017) 12 Cal.App.5th 229, 239.) Under the statute, the court, in its role as trier of fact, may disbelieve some witnesses while crediting the testimony of other witnesses. (*Ibid.*)

Appellate decisions often state the reviewing court is bound by the trial court's credibility determinations. (E.g., *In re Marriage of Ciprari* (2019) 32 Cal.App.5th 83, 94.) This slight overstatement reflects the great deference appellate courts give a trier of fact's credibility findings. As a result of this deference, it is very difficult for an appellant to successfully challenge a trial court's finding that all or part of a witness's testimony is *not credible*. The applicable rule of law provides that "[a] trier of fact is free to disbelieve a witness, even one uncontradicted, if there is any rational ground for doing so." (*In re Jessica C.* (2001) 93 Cal.App.4th 1027, 1043.) Rational grounds for disbelieving a witness include the factors listed in Evidence Code section 780, which includes the witness's interest in the matter. (Evid. Code, § 780, subd. (f); see *Pierce v. Wright* (1953) 117 Cal.App.2d 718, 724.)

Here, Thompson has not acknowledged the any-rational-grounds test and, thus, has failed to present any analysis of its application to the facts of this case. We conclude the grounds expressly given by the court qualify as rational grounds for disbelieving Thompson's testimony about the existence of a written partnership agreement. For instance, Thompson's personal interest in the subject of the litigation, standing alone, provides a rational ground for disbelieving his testimony. (See Evid. Code, § 780, subd. (f).) Therefore, under the deferential standard of appellate review, we further conclude that the trial court did not commit reversible error when it disbelieved some of Thompson's testimony. The any-rational-grounds test is satisfied. Therefore, we defer to the trial court's credibility finding. (See *In re Marriage of Boswell* (2014) 225 Cal.App.4th 1172, 1175; *Falahati v. Kondo* (2005) 127 Cal.App.4th 823, 828.)

Next, we consider Thompson's argument that the trial court violated Evidence Code sections 352 and 788 by failing to explicitly address those sections in its ruling. Evidence Code section 788 states that "[f]or the purpose of attacking the credibility of a witness, it may be shown … that he has been convicted of a felony." In *People v. Castro* (1985) 38 Cal.3d 301, the court addressed the nature of prior convictions that may be

20.

used for impeachment of witnesses *in a criminal case*. (*Id*. at p. 306.) The court concluded that felony convictions that necessarily involve moral turpitude may be used and convictions of felonies that do not necessarily involve moral turpitude may not be used. (*Ibid*.) Here, Thompson's conviction for first degree murder qualifies as a crime denoting moral turpitude. (See *People v. Hinton* (2006) 37 Cal.4th 839, 888 [the defendant's convictions for murder and attempted murder denoted moral turpitude].) Therefore, the trial court did not err in reaching the legal conclusion that Thompson's felony conviction involved moral turpitude. Consequently, we conclude the court properly considered that conviction in assessing Thompson's credibility. (See also *Robbins v. Wong* (1994) 27 Cal.App.4th 261, 274 [moral turpitude requirement does not apply in civil cases].)

Thompson's other arguments attacking the credibility finding are not addressed in detail because they are, in practical effect, in disagreement with the weight the trial court attached to the factors considered in making the credibility finding. In our role as a court of review, we do not reweigh the evidence when assessing a trial court's credibility determinations. (*Gee v. Greyhound Lines, Inc.* (2016) 6 Cal.App.5th 477, 492.)

## V.       *The trial court did not abuse its discretion in denying Thompson's motion to continue the trial and reopen discovery.*

Thompson asserts that the trial court improperly denied his motion to continue the trial and reopen discovery. The motion was filed on January 4, 2019, three days before trial was scheduled to commence, and stated it was made on the ground that the Lujans and the Dorners had misused the discovery process. As described below, we conclude the trial court did not abuse its discretion when it denied the motion.

Trial courts are vested with "wide discretion" to allow or prohibit discovery. (*Emerson Electric Co. v. Superior Court* (1997) 16 Cal.4th 1101, 1107.) Continuance

motions are generally disfavored (see California Rules of Court, rule 3.1332(a))**10** and should only be granted upon a showing of good cause (*County of San Bernardino v. Doria Mining & Engineering Corp.* (1977) 72 Cal.App.3d 776, 779). Pursuant to Rule 3.1332(c)(6), a party's inability to obtain essential testimony, documents, or other material evidence despite the party's diligent efforts in that regard may constitute good cause. "The grant or denial of a continuance to permit discovery is a matter within the sound discretion of the trial court, whose ruling will not be disturbed except upon a clear showing of abuse." (*Day v. Rosenthal* (1985) 170 Cal.App.3d 1125, 1173.) Accordingly, we apply the abuse of discretion standard of review to the trial court's denial of a request for continuance.

" ' "An abuse of discretion occurs if, in light of the applicable law and considering all of the relevant circumstances, the court's decision exceeds the bounds of reason and results in a miscarriage of justice. [Citations.] This standard of review affords considerable deference to the trial court provided that the court acted in accordance with the governing rules of law. We presume that the court properly applied the law and acted within its discretion unless the appellant affirmatively shows otherwise." ' " (*Espejo v. The Copley Press, Inc.* (2017) 13 Cal.App.5th 329, 378.)

Section 2024.020 requires litigants to complete discovery proceedings at least 30 days before trial and that discovery motions be heard at least 15 days before the date initially set for the trial of the action in question. Here, the discovery deadline was December 8, 2018, and the motion deadline was December 23, 2018. Before December 2018, Thompson had filed motions to compel further discovery responses from both the Lujans and the Dorners. The trial court granted those motions and the Lujans and the Dorners provided supplemental discovery responses in September and December of 2018, respectively. When Thompson filed his motion to continue the trial and reopen

---

**10**      Subsequent references to a numbered "Rule" are to the California Rules of Court.

discovery on January 4, 2019, the statutory deadlines for filing any further discovery motions had expired.

Trial courts are given wide discretion to manage their trial calendars. (See Gov. Code, § 68607 [judges have a duty to eliminate delay and manage litigation, including utilizing a firm policy against continuances].) Under Rule 3.1332, the discretionary authority to grant a continuance is predicated upon diligent efforts on the part of the litigant seeking such relief. In this instance, Thompson displayed no such requisite diligence to constitute good cause for a continuance. The fact that Thompson by his own admission had at least 47 months to conduct discovery and still had not completed it to his satisfaction supports the trial court's implied finding that he did not act with sufficient diligence. This finding, in turn, supports the denial of the continuance. In terms of the applicable standard of review, the lack of diligence is a relevant circumstance showing the court did not exceed the bounds of reason. (See *Espejo v. The Copley Press, Inc.*, *supra*, 13 Cal.App.5th at p. 378.)

## VI. *The trial court did not abuse its discretion in considering the five-year rule.*

Thompson contends that the trial court erroneously applied a five-year rule to set his case for trial at the case management conference on October 18, 2018, and that the time constraint prejudiced him by preventing him from "obtaining critical discovery." He explains that "the case was forced into trial without the completion of discovery based upon the court's factual determination that time constraints applied." He also claims that the time restraint should not have applied to his case because the period was tolled for 13 months during the appeal following the demurrer to his second amended complaint, and during the Lujans' default.

The five-year rule is set forth in section 583.310, which states: "An action shall be brought to trial within five years after the action is commenced against the defendant." The failure to comply with this provision is addressed in subdivision (a) of

23.

section 583.360, which states that an action shall be dismissed if it is not brought to trial within the prescribed time. The computation of the five-year period excludes the time during which "[t]he jurisdiction of the court to try the action was suspended." (§ 583.340, subd. (a).) Under this provision, the time a case is on appeal is excluded from the five-year period because a trial court loses jurisdiction over a case once it is appealed and regains jurisdiction on the issuance of a remittitur. (E.g., *Alpha Media Resort Investment Cases* (2019) 39 Cal.App.5th 1121, 1125, fn. 3 [trial court lost jurisdiction over matter for 17 months while one of the parties appealed an order denying arbitration].)

Thompson's complaint against the Lujans in this matter was filed on January 24, 2014, and trial began on January 7, 2019, just within five years after the action commenced. At the case management conference on October 18, 2018, Thompson did not object to the January 7, 2019 trial date when it was proposed. The reporter's transcript of that conference shows the trial court's view of the five-year period, which did not exclude the time the case was on appeal, was a motivating factor in the trial court's decision to schedule the trial in January 2019. However, because Thompson did not object to that date, he did not preserve for appeal the specific argument that the date was set based on a misinterpretation of the five-year rule.

The remainder of Thompson's arguments about the five-year rule are, for practical purposes, a restatement of his arguments that the trial court abused its discretion by failing to continue the trial and reopen discovery. Here, the court acted rationally in considering the age of the lawsuit and the manner Thompson had conducted discovery over the course of the litigation, including the failure to subpoena witnesses, as part of its evaluation of Thompson's request for a continuance. In light of these circumstances, we cannot conclude the court exceeded the bounds of reason when it denied the continuance.

**VII.  *The motion to take evidence and request to make findings of fact is denied.***

In August 2019, Thompson filed a motion with this court requesting leave to produce additional evidence pursuant to section 909 and Rule 8.252(c).  The evidence consisted of two declarations of Briseno (Pavlik's sister), Thompson's declaration, and the September 2018 declaration of Miller (Thompson's mother).  The declarations supported Thompson's testimony at trial concerning the existence of a written general partnership agreement between Thompson and Pavlik.  Thompson's stated purpose was to obtain a reversal of the trial court's judgment.  Thompson contended his due process rights were violated by the trial court when it declined to consider the declarations of Briseno and Miller in lieu of their in-court testimony, which testimony Thompson failed to secure at trial.

Thompson contends the trial court's refusal to delay the trial for two days so that Briseno could testify and corroborate his own testimony regarding the existence of a written general partnership agreement between himself and Pavlik constituted a miscarriage of justice.  He also contends the trial court, as an alternative to granting a continuance, should have considered the declarations of Briseno and Miller in lieu of their in-court testimony, and the court's failure to do so violated his due process rights.

This court deferred ruling on Thompson's motion for leave to produce additional evidence, pending consideration of the merits of the appeal.  Thompson's subsequently filed opening brief referred to article VI, section 11 of the California Constitution and section 909 and requested this court to make certain enumerated findings of fact.  Thompson contends his proposed findings "are contrary to and in addition to those made by the trial court, specifically involve a question of law, and are based on uncontroverted evidence addressed before the trial court."

**A.  Applicable law**

"The Legislature may permit courts exercising appellate jurisdiction to take evidence and make findings of fact when jury trial is waived or not a matter of right."

(Cal. Const., art. VI, § 11, subd. (c).) The Legislature exercised this authority by enacting section 909, which provides in full:

> "In all cases where trial by jury is not a matter of right or where trial by jury has been waived, the reviewing court may make factual determinations contrary to or in addition to those made by the trial court. The factual determinations may be based on the evidence adduced before the trial court either with or without the taking of evidence by the reviewing court. The reviewing court may for the purpose of making the factual determinations or for any other purpose in the interests of justice, take additional evidence of or concerning facts occurring at any time prior to the decision of the appeal, and may give or direct the entry of any judgment or order and may make any further or other order as the case may require. This section shall be liberally construed to the end among others that, where feasible, causes may be finally disposed of by a single appeal and without further proceedings in the trial court except where in the interests of justice a new trial is required on some or all of the issues."

Rule 8.252(c)(1) addresses evidence on appeal by stating that "[a] party may move that the reviewing court take evidence." It also specifies what an order granting the motion must contain and allows appellate courts to admit documentary evidence without a hearing. (Rule 8.252(c)(2), (3).)

Our Supreme Court has stated that the authority granted by section 909 " 'should be exercised sparingly.' " (*In re Zeth S.* (2003) 31 Cal.4th 396, 405.) "Absent exceptional circumstances," an appellate court should not make findings on appeal. (*Ibid.*, italics omitted.)[11] The rationale for this requirement is the long-standing general rule that " 'an appeal reviews the correctness of a judgment as of the time of its rendition, upon a record of matters which were before the trial court for its consideration.' " (*In re Zeth S.*, at p. 405.) This general rule reflects the different functions performed by trial

---

[11] Exceptional circumstances were deemed to exist and, thus, the appellate court took evidence and made factual findings in cases where the evidence (1) supported a missing factual finding necessary for affirmance, (2) was used to correct a clerical error in the trial court's factual findings, and (3) established an event that rendered the appeal moot. (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2020) ¶¶ 5:173 to 5:176, pp. 5-66 to 5-67.) None of these circumstances exist in the present appeal.

and appellate courts—trial courts decide questions of fact and appellate courts decide questions of law. (*Ibid*.) "The rule promotes the orderly settling of factual questions and disputes in the trial court, provides a meaningful record for review, and serves to avoid prolonged delays on appeal." (*Ibid*.)

Accordingly, section 909 "is not intended to usurp the trial court's fact-finding authority." (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs, *supra*, ¶ 5:169, p. 5-64.) "As a basic principle of appellate review, the proffered new evidence must enable the appellate court to *affirm* the judgment, not lead to a reversal; and appellate courts will not use [section] 909 to *resolve conflicts in the evidence* or to *substitute their own factual determinations for those of the trial court*." (*Id*. at p. 5-65; see *Monsan Homes, Inc. v. Pogrebneak* (1989) 210 Cal.App.3d 826, 830.) In accordance with these principles, the Sixth District Court of Appeal stated that the power of an appellate court to take evidence under section 909 "is never used where there is conflicting evidence in the record and substantial evidence supports the trial court's findings." (*Philippine Export & Foreign Loan Guarantee Corp. v. Chuidian* (1990) 218 Cal.App.3d 1058, 1090.)

Thompson's motion and opening brief acknowledge most of the foregoing principles and quote the Supreme Court's statement that "most of the decisions limiting the use of this power involved attempts to introduce on appeal evidence which (1) existed at the time of trial, (2) was contested on appeal or was cumulative of the evidence that was contradicted at trial, and (3) was not conclusive on the question for which its admission was sought." (*In re Elise K.* (1982) 33 Cal.3d 138, 149 (*Elise*).) Thompson is mistaken, however, in asserting that these factors do not apply to the evidence presented by his motion.

## B. Analysis

First, by Thompson's own admission, the testimony he expected Briseno and Miller to give existed well before the January 2019 trial of this matter. Furthermore, this court has reviewed the declarations of Briseno and Miller to determine whether the matters described in the declarations occurred before the trial and, if so, whether they were discovered after the trial. It appears from our review that the information offered in the declarations existed at the time of trial. Accordingly, the first factor identified in *Elise* weighs against the exercise of our discretionary authority to take evidence and make findings.

Second, the expected testimony of Briseno and Miller is contested on appeal. In particular, defendants contest the use of the evidence to overturn the trial court's credibility finding and its related determination that Thompson did not carry his burden of proving such an agreement existed. Thus, the second *Elise* factor weighs against exercising our discretionary authority to take evidence and make findings.

Third, the declarations of Briseno and Miller cannot be regarded as conclusively establishing a written partnership agreement existed. The most convincing evidence of the existence of a document would be the document itself or photographs or photocopies of the document. Miller's declaration asserts she is "able to testify as to the details of their business partnership" but does not include any details about the existence of a written partnership agreement. Briseno's September 2018 declaration states that Thompson and Pavlik "met and became business partners" but does not mention a written partnership agreement. In contrast, Briseno's July 2019 declaration refers to a general partnership document. However, it does not describe the terms of the agreement or the partnership assets. Consequently, the declarations do not conclusively establish the existence of a written partnership agreement covering the property in which Thompson claims an interest.

Also, the declarations do not conclusively establish that Thompson was a credible witness. One concern is that the statements made in the declarations were not subject to cross-examination, which is significant because cross-examination is an important mechanism in the truth-seeking function of a trial. (*People v. Galan* (2009) 178 Cal.App.4th 6, 8.) Another concern is that the declarations contain hearsay—that is, statements that are made other than by witnesses while testifying at the hearing of the matter in question, which are offered to prove the truth of the matter stated therein. (Evid. Code, § 1200, subd. (a).) Except as provided by law, hearsay evidence is inadmissible. (*Id.*, § 1200, subd. (b).) "[H]earsay evidence is less reliable than live testimony." (*Kulshrestha v. First Union Commercial Corp.* (2004) 33 Cal.4th 601, 608.) Therefore, we conclude the hearsay evidence in the declaration, untested by cross-examination, does not conclusively demonstrate Thompson was a credible witness. Accordingly, the third *Elise* factor weighs against exercising our discretionary authority to take evidence and make findings about the existence of a partnership agreement or Thompson's credibility.

Next, we consider factors besides those listed in *Elise* in evaluating Thompson's motion and related request to make findings of fact. Thompson's motion states it was made for the purpose of reversing the trial court. Thus, granting the motion would be contrary to the principle that "the evidence normally must enable the Court of Appeal to affirm the judgment, not lead to a reversal." (*Philippine Export & Foreign Loan Guarantee Corp. v. Chuidian*, *supra*, 218 Cal.App.3d at p. 1090.)

Based on the foregoing, we decline to exercise our discretionary authority to take evidence and make findings of fact. Accordingly, we will not grant Thompson's motion for leave to produce additional evidence or make findings on the factual issues specified in his opening brief.

## **DISPOSITION**

The judgment is affirmed.  Thompson's motion to present additional evidence on appeal is denied.  Each party shall bear its own costs on appeal.


      HILL, P. J.

WE CONCUR:


FRANSON, J.


PEÑA, J.

30.